G.L., An Infant, By and Through his Next Friend, William SHULL, D.T., An Infant, by and through her Next Friend, Cathy Connealy, R.M., An Infant, by and through his Next Friend Millard Aldridge, K.W., An Infant, by and through her Next Friend, Janeen Weiss, and T.W., An Infant, by and through his Next Friend, Janeen Weiss, Plaintiffs,

v.

John ZUMWALT, individually and as State Director of the Missouri Division of Family Services, J. Joseph Lewis, individually and as County Director of the Jackson County Office of the Missouri Div. of Family Services, Sandra Brooks, individually and as County Director of the Clay County Office of the Missouri Div. of Family Services, Sherrell Hunt, individually and as Social Service Supervisor of the Jackson County Office of the Mo. Div. of Family Services; and Gail Horsey, individually and as Social Service Supervisor of the Jackson County Office of the Missouri Div. of Family Services, Defendants.

No. 77-0242-CV-W-4.

United States District Court, W.D. Missouri, W.D.

March 21, 1983.

Effie F. Day, William Dittmeier, Thomas P. O'Donnell, Candace M. Zierdt, Legal Aid of Western Missouri, Kansas City, Mo., David M. Hashmall, Marcia Robinson Lowry, Michael B. Mushlin, Lauren Anderson, Children's Rights Project American Civil Liberties Union, New York City, for plaintiffs.

William F. Arnet, J. Paul Allred, Jr., Weldon W. Perry, Jr., Jerry Short, Nancie Aulgur, Asst. Attys. Gen., Jefferson City, Mo., for defendants.

## MEMORANDUM

RUSSELL G. CLARK, Chief Judge.

Counsel for all parties presented, and the Court approved a consent decree regarding the provision of foster care for children in the Kansas City, Missouri area. It is at the request of plaintiffs' counsel and because of the assistance this case may render other courts considering similar questions that the consent decree is published. *Goldsby v. Carnes,* 365 F.Supp. 395, 396 (W.D.Mo.1973).

I N D E X

I. Licensing of Foster Homes ........... 1031
II. Mandatory Training of Foster Parents .. 1033
III. Proper Matching of Foster Children with Foster Parents .............. 1033
IV. Pre-Placement Process and Supervision of the Foster Home .............. 1034
V. Prohibition on the Use of Improper Punishment of Foster Children ..... 1035
VI. Investigation of and Response to Suspected Incidents of Abuse and Neglect or Unsuitable Care .... 1035
VII. Elimination of Overcrowding in the Foster Home .................... 1036
VIII. Rate of Reimbursement .............. 1036
IX. Caseload Size ....................... 1036

I N D E X—Continued

X. Social Service Worker Training ........ 1036
XI. Medical Care ....................... 1037
XII. Essential Services ................... 1038
XIII. Permanency Planning ............... 1038
XIV. Establishment of Uniform Case
Record System ................. 1041
XV. Reporting and Monitoring ........... 1042
XVI. Costs and Attorneys' Fees ........... 1043
XVII. Damage Claim ..................... 1043

## CONSENT DECREE

Plaintiffs, identified as children in the custody of the Jackson County Office of the Missouri Division of Family Services, brought this action on March 28, 1977, challenging practices and policies of defendants as violative of their rights to be protected from harm secured by the United States Constitution and by Title IV of the Social Security Act. On April 20, 1979, the Court certified this case as a class action for injunctive and declaratory relief. The defendants have denied that they have violated plaintiffs' rights. The case has been scheduled by the Court for trial on May 9, 1983. The parties have now agreed that it is in the best interests of all the parties that the case be resolved amicably between them without the necessity of trial. Accordingly,

IT IS HEREBY STIPULATED by and between the parties, and subject to approval by the Court that the following agreement will be incorporated in a final judgment by consent in this case:

1. The Court has jurisdiction of the subject matter of this action and of all parties hereto. The Court has authority to grant the relief provided in this agreement.

2. Plaintiffs shall be protected from harm by defendants while plaintiffs are in foster care. To secure this right the defendants shall implement the following practices and procedures:

### I. *Licensing of Foster Homes*

A. Defendants will establish a process to ensure that only those persons who possess the requisite qualities to be suitable foster parents and who are capable of providing a healthy, nurturing and safe home, are licensed to provide foster care for plaintiffs.

Toward that end defendants shall adopt and implement the following practices.

### B. Licensing Workers

1. The assessment study of each prospective foster parent shall be done by a professional social worker and approved by a Social Service Supervisor.

2. All social service workers who have responsibility for the licensing or renewal of licenses of foster homes shall receive two days of orientation training covering the licensing process, the practice issues attendant to the conduct of a home study and the decisions involved in assessing the suitability of the home and adequacy of parenting skills. They shall also be trained as to the specific psychological, emotional, physical and educational problems that foster children are likely to have.

3. Thereafter, all licensing workers shall receive one day of state-of-the-art training per year focused on standards and methods of assessing the acceptability of applicants for foster home licenses.

4. This training shall be conducted by qualified DFS employees or by outside consultants who are not in the regular employ of DFS.

5. The curriculum and written materials utilized in the training of licensing workers shall be provided to counsel for plaintiffs at least thirty (30) days prior to the commencement of the training. Defendants shall not unreasonably refuse to implement plaintiffs' suggested revisions to the curriculum and written materials. This review process will continue for a period of five (5) years from the date of entry of this decree.

### C. The Assessment Process

1. Prior to the licensure of a foster home, the licensing worker shall:

a. Interview each member of the family, including children and other adults living in the home, individually and collectively.

b. Conduct a home visit to evaluate the physical conditions of the home and the community which shall include an assessment of the home, living arrangements for the foster children, the community in which

the prospective foster parents live, and the special resources available in the community such as diagnostic clinics, medical care, schools and recreational facilities.

c. Interview at least three references by either personal or telephone contact.

d. Review the Child Abuse Registry and police records.

e. Assess the foster parents and their children's physical and mental health which shall include:

1. A physical for each parent using a form which will be developed by defendants and which will be submitted to plaintiffs' counsel for approval within thirty (30) days of the date of entry of this decree.

2. History of hospitalization for either physical or emotional problems, including the reason and extent of the hospitalization, date(s) and current extent of problems.

3. Determine if any member of the family now living in the house ever received outpatient treatment at a mental hospital, mental health clinic, psychiatric clinic or from a psychiatrist, and if so provide reason, extent and nature of problems, date(s) and current extent of problems.

4. Determine if any member of the family now living in the house ever received treatment for drug abuse, alcoholism or alcohol abuse, or drug overdose, and if so provide the nature of the condition, extent and nature of treatment, date(s) and current state of problem.

f. Obtain a verification of employment or, verification of adequate financial income.

g. As part of the homestudy process, the licensing worker shall assess the prospective foster parents' willingness to work with the child's natural parents and their attitudes towards discipline.

2. DFS regulations shall specify essential information regarding parenting skills which must be elicited in the homestudy.

3. These steps shall be accomplished, a recommendation made, and approval or denial of the application made within ninety (90) days of receipt of the foster parent application.

D. Relative Foster Home

All relative foster homes shall be licensed or approved in the same manner as non-relative foster homes.

E. Emergency Foster Homes

Certain foster homes and shelters shall be licensed specifically for emergency foster care. These homes and shelters will only be used for children on a short term basis of no more than thirty (30) days. The emergency foster homes shall be licensed in the same manner as other foster homes. Unless extraordinary circumstances make it impossible in a particular case, a home shall not be used for short term foster care unless it is specifically licensed for these cases. Any exceptions to the provisions of this section shall be documented in writing and approved by a supervisor.

F. Renewal of Licenses

1. Licenses shall be renewed at least once every two (2) years.

2. Prior to the license being renewed, the licensing worker will consult with the social service workers for each child in the home or who has been in the home in the previous two years to evaluate the ability of the foster parents to deal with foster children, the agency and the foster children's natural parents.

3. The licensing worker shall interview all members of the foster family's household, including foster children individually.

4. The licensing worker shall evaluate the physical conditions of the home.

5. No foster parent shall have his/her license renewed if he/she has not completed the requisite number of foster parent training courses (see § II, *infra*).

6. The foster parent must be in full compliance with his/her license and all applicable regulations and must be deemed to be performing adequately as a foster parent prior to his/her license being renewed.

7. The licensing worker shall provide a written recommendation, approved by a Social Service Supervisor, that the foster par-

ent has provided adequate care, continues to meet DFS standards and that the license should be renewed.

G. Suspension of License

Unless the social service worker recommends, with the written approval of the supervisor, that the foster parent can be assisted in rectifying the problems which were "substantiated" or classified as "reason to suspect" by the investigation of an incident of child abuse or neglect, and that the foster parent is ready, willing and able to utilize such assistance in changing his/her behavior, the license of any foster parent who is the subject of a report of child abuse or neglect which has been "substantiated" or classified as "reason to suspect" must be suspended immediately and the child or children removed to an appropriate foster home situation pending resolution of the grievance process established by defendants for foster parents.

II. *Mandatory Training of Foster Parents*

A. All foster parents shall receive special training in the parenting skills needed to raise a foster child in order to lessen the likelihood of abuse or neglect of foster children and to reduce the frequency of movements of foster children.

B. Pre-service Training

1. Prior to receiving a license to be a foster parent, all prospective foster parents must complete a foster parent training course of at least twelve (12) hours.

2. This course shall at a minimum provide the foster parent with knowledge of the structure of the agency; the role of the caseworker and the foster parent's relationship with the caseworker; applicable DFS regulations; the special needs of foster children; the need to work with the natural parents; appropriate disciplining methods and alternatives to corporal punishment; and the importance of utilizing medical, dental, educational and other community resources.

C. Continuing Foster Parent Training

1. All foster parents must receive at least ten (10) hours of foster parent training per year.

2. No foster parent's license may be renewed unless they have received the requisite number of hours of training.

D. Training in the Prevention of Abuse and Neglect

1. Within two (2) years after this decree is entered, all presently licensed foster parents shall take a thirty (30) hour course in the prevention of abuse and neglect of foster children and appropriate methods of discipline.

2. All foster parents licensed after the signing of this decree shall take such a course within the first year after being licensed.

3. The foregoing provisions shall be contingent upon the availability of the National Foster Care Education Program or another mutually agreed upon program to assist DFS in the development of the training.

E. All of the foregoing training shall be provided at no cost to the foster parent.

F. Curriculum

1. The curriculum and written materials to be used shall be developed and supervised by qualified DFS employees or by outside consultants with previous experience in foster parent training.

2. The curriculum and written materials to be used shall be submitted to counsel for plaintiffs within sixty (60) days of the entry of this decree. Defendants shall not unreasonably refuse to implement plaintiffs' revisions to the curriculum and written materials. This review process will continue for a period of five (5) years from the date of entry of this decree.

3. The resumes of each person who will be responsible for the development and supervision of the program shall be provided to plaintiffs.

III. *Proper Matching of Foster Children with Foster Parents*

A. Foster children shall be carefully matched with foster parents to ensure that

the foster parent is able to meet the child's needs and to prevent improper matching.

B. Essential Elements of Proper Matching

The placement of a child in a foster home shall in all cases be in conformity with the licensing restrictions for that home and with the foster parents' expressed preferences.

C. Training and Supervision

1. DFS shall designate an employee with training and experience in matching to supervise the placement process and approve each foster home placement.

2. All social service workers who have responsibility for the placement of foster children must receive a minimum of six (6) hours of training on proper placement practices.

3. The curriculum and written materials to be utilized in this training shall be submitted to plaintiffs' counsel at least thirty (30) days prior to the commencement of training. Defendants shall not unreasonably refuse to implement plaintiffs' suggested revisions of the curriculum and written material.

4. The social service worker shall document, in writing, why a particular foster home is recommended for a child.

5. Each placement must be approved by the matching supervisor, in writing.

IV. *Pre-Placement Process and Supervision of the Foster Home*

A. Defendants shall prepare the foster child and foster parents for each new placement in order to ensure that an appropriate match has been made and to reduce unnecessary movement of foster children.

B. Preparation of the Child

1. The child shall be provided with as much information about the prospective foster family as possible, including but not limited to family composition, location, living accommodations, schools, and photographs whenever possible.

2. The child should be helped to cope with the trauma of separation.

3. The social service worker shall prepare a life book with the foster child.

C. Preparation of the Foster Family

1. The social service worker shall provide the foster family with as much pertinent information on the child as is available, to assist them in deciding if they want to accept the child, including, but not limited to:

a. The reasons for the child being in the foster care;

b. The child's relationship with his/her natural family;

c. Any psychological or behavioral problems the child may have;

d. The child's progress in school;

e. The child's complete medical history (in writing) including, but not limited to:

1. Any medications the child is currently using;

2. History of childhood illnesses;

3. History of vaccinations and inoculations;

4. Any chronic medical problems;

f. Any special needs of the child.

D. Pre-Placement Visit

1. At least one (1) pre-placement visit in the foster parents' home shall be arranged at least two (2) weeks in advance of the placement.

2. The following persons should be present at the visit:

a. The child;

b. The child's social service worker;

c. The child's natural parents, or other appropriate member of the natural family;

d. Any children or other persons living in the foster home.

3. Whenever possible a second pre-placement visit, by the child, preferably overnight, should occur.

E. Supervision by Social Service Worker

1. The child's social service worker shall visit the child in the foster home within twenty-four (24) hours after placement and weekly for the first month of placement

and, thereafter, at a minimum of every two (2) weeks to monitor the placement. Telephone contact is not an acceptable substitute for a face-to-face visit.

The social service worker shall meet with the child alone and in the presence of the foster parents in order to adequately assess the nature of the relationship and to learn of any problems in the home.

F. Relative Foster Homes

The provisions of this section shall be equally applicable to relative foster homes.

G. Emergency Placements

1. Except in the case of an emergency placement, the pre-placement provisions of this section shall be strictly adhered to.

2. An emergency does not exist unless there is imminent danger of physical abuse to the child in his or her present placement.

3. All emergency placements shall be approved by a Social Service Supervisor. In the event that an emergency situation exists which requires immediate placement or placement on less than two (2) weeks notice, whenever possible a pre-placement visit shall nevertheless take place even if it occurs on the same day as the actual placement.

H. Supervision

The supervisor shall review the social service worker's records on a monthly basis to ensure that the home is being properly supervised and to assist in identifying and rectifying any problems.

V. *Prohibition on the Use of Improper Punishment of Foster Children*

A. Defendants shall prohibit any inappropriate punishment of foster children.

B. Ban of Corporal Punishment

1. The use of corporal punishment by foster parents against foster children shall be prohibited.

2. The social service worker shall assist the foster parent in the development of appropriate alternative forms of discipline.

C. Reporting and Follow-Up

1. Anytime a social service worker has reason to believe that a foster parent has used an inappropriate method of discipline, it is to be documented, in writing, and immediately reported to the social service worker's supervisor.

2. All such cases shall be referred to the Central Registry Unit and also to the Juvenile Court for investigation.

3. If, notwithstanding the inappropriate punishment, a decision is made not to revoke the foster parent's license, the foster parent will receive intensive supervision and assistance in developing appropriate methods of discipline.

VI. *Investigation of and Response to Suspected Incidents of Abuse and Neglect or Unsuitable Care*

A. Defendants shall respond to all cases of suspected incidents of abuse and neglect, or of unsuitable care by foster parents of plaintiffs in order to prevent aggravation of harm by a child's continued placement in an unsafe setting.

B. Investigation and Follow-Up

1. All instances of suspected abuse and neglect by foster parents shall be referred immediately to the Central Registry Unit and to the Juvenile Court for investigation.

2. The social service worker shall also immediately report all such instances to a social service supervisor.

3. A decision shall be made within 48 hours as to the need to remove the child or other foster children from the home. This decision shall be approved by the supervisor. If removal is appropriate, the child or children shall be immediately removed pending resolution of the grievance process established for foster parents. If intensive supervision is needed, it shall be provided immediately.

4. In the case of "substantiated abuse or neglect" and/or "reason to suspect abuse and neglect" by the foster parent to a foster child in a foster home maintained by DFS, or in the case of inappropriate treatment of foster children, DFS should schedule a conference immediately to determine

whether that home is suitable for continuation of foster care.

### VII. *Elimination of Overcrowding in the Foster Home*

A. DFS shall not place any member of plaintiffs' class in an overcrowded foster home.

B. Number of Children in the Home

1. At no time shall the number of children in a foster home exceed six (6), including the foster parents' children, with the exception of foster children sibling groups.

2. Supervisory approval shall be required whenever the number of children in the home exceeds four (4).

3. There should never be more than two (2) children under the age of two in a foster home or four (4) pre-school age children unless necessary to accommodate a sibling group.

4. When a home is first licensed, no more than one child at a time shall be placed in the home for the first six (6) months, except in the case of siblings who are placed together.

5. If both foster parents are employed outside of the home, DFS shall ensure the adequate provision of approved day care services.

6. If the foster parent is also a licensed day care provider, no child under the age of seven shall be placed in that home.

### VIII. *Rate of Reimbursement*

A. DFS shall provide each foster parent with an appropriate rate of reimbursement in order to increase the pool of foster parents, and to ensure that the foster parents adequately meet the needs of the foster child.

B. Rate of Reimbursement

Defendant shall, on an annual basis, beginning in Fiscal Year 1985, request and lobby the legislature for a budget line item providing a rate of reimbursement equivalent to the rate determined by the United States Department of Agriculture as necessary to adequately care for children in urban areas of the region of the country that includes the state of Missouri.

### IX. *Caseload Size*

A. Defendants shall prohibit excessive caseloads which prevent social service workers from providing adequate services to children and natural parents and from providing appropriate supervision and support of foster parents. To that end defendants shall adopt and implement the following caseload limits:

B. *Caseload Size of Social Service Workers*

1. DFS social service workers should never have caseloads that exceed twenty (20) to twenty-five (25) children per social service worker. Any exception to the provisions of this section shall only be on a temporary and emergency basis.

2. If a social service worker leaves DFS, that caseload will be assigned to other social service workers within a maximum of two (2) weeks.

3. A supervisor shall only be responsible for a caseload during the time that it takes to reassign cases as provided in ¶ B.2, *supra*.

C. Ratio of Social Service Workers to Supervisors

The ratio of immediate supervisors to social service workers should be seven to one to ensure adequate supervision. Supervisors should meet with social service workers at least twice a month.

### X. *Social Service Worker Training*

A. To effectively implement the provisions of this decree and to ensure that the needs of the child, the natural parents and the foster parent are met, continuing social service worker training shall be required. This is in addition to specific courses of training referred to in sections I and III, *supra*.

B. Training Program

1. A formal pre-service and in-service training program shall be established.

2. The training program shall be in writing and shall use state-of-the-art material.

3. The training program shall be developed and supervised by qualified DFS employees or by outside consultants not in the regular employment of DFS.

4. At a minimum, all supervisors shall receive at least one (1) week training during the first three (3) months they are in a supervisory position and at least two (2) days each year thereafter with training provided by qualified DFS employees or by outside consultants. This training shall be for the purpose of developing and improving supervisory skills.

5. All social service workers shall receive one (1) week of training within their first month of work and at least four (4) days each year thereafter.

C. Training in Prevention of Abuse and Neglect

1. Within two (2) years of the signing of this decree all social service workers and supervisors shall receive sixteen (16) hours of training in the prevention of abuse and neglect of foster children.

2. Thereafter, all new social service workers and supervisors shall receive such training within six (6) months of their hiring.

3. The foregoing provisions shall be contingent upon the availability of the National Foster Care Education Program or another mutually agreed upon program to assist DFS in the development of this training.

## XI. *Medical Care*

A. Defendants shall establish an adequate medical care system to ensure that foster children's medical, dental and mental health needs are adequately met. Defendants shall meet this obligation as outlined in paragraphs B, C, and D, *infra.*

B. Beginning on or about July 1, 1983, DFS shall enroll each foster child in either a health maintenance organization or a prepaid health plan which shall provide a full range of medical services for each child.

C. DFS shall designate an appropriately trained person who will monitor the delivery of medical services and ensure that the medical needs of all children are met. This person shall have the medical records of all children in DFS custody.

D. DFS will ensure the following:

1. All children shall receive a complete medical examination within 24 hours of coming into DFS custody or the next working day.

2. All children will receive a dental, hearing and eye examination within one (1) month after coming into DFS custody.

3. DFS shall obtain a complete medical history for each child when they come into DFS custody including, but not limited to:

(a) any chronic ailments

(b) history of childhood illnesses

(c) history of inoculations and immunizations

(d) any history of psychological problems

(e) dental records to the extent that they exist

(f) name(s) of any previous doctors

(g) any allergies

(h) any medications the child is using.

4. DFS shall provide a prospective foster parent in writing with a complete medical record for each foster child.

5. All children shall receive examinations at the times set forth by the Early Periodic Diagnosis and Treatment Program.

6. All children shall receive annual dental and eye examinations.

7. DFS shall ensure that a child receives all follow-up medical treatment recommended by a doctor including the scheduling of additional appointments and obtaining necessary medication. The need for follow-up treatment shall be clearly indicated in the child's medical record and monitored. A plan for such treatment shall be formulated in consultation with the treating physician, dentist or the qualified health care provider. A copy of the plan shall be given to the employee designated to moni-

tor health care. The plan shall include the time periods for the treatment. When the plan has been achieved it shall be recorded in the child's record along with a statement by the treatment professional that the condition noted has been remedied to the point that there is no future need for treatment. If a further checkup is indicated at a future date this should be noted in the record and should be reviewed by the employee designated to monitor health care.

8. DFS shall maintain accurate medical records for each child, including, but not limited to:

(a) Complete medical history as set forth in section 3 above.

(b) Record of all medical, dental and eye examinations.

(c) Record of all inoculations, medical tests and prescribed medications.

(d) An indication as to when the next medical examination should occur.

9. The foster parent shall be responsible for taking a child to all necessary medical appointments. If a foster parent is unable to take a child to medical appointments, DFS shall either remove those obstacles by providing carfare or babysitting or, as a last resort, the child's social service worker shall take the child to the appointment.

10. The continued failure or refusal by a foster parent to ensure that a foster child receives adequate medical attention shall be considered to be cause for license revocation.

## XII. *Essential Services*

A. Defendants shall ensure that essential services are provided to all foster children to treat psychological, emotional and intellectual problems that any foster children may suffer.

B. No later than thirty (30) days after coming into foster care, the social service worker shall evaluate whether the child has any psychological, emotional or intellectual problems. If the child is in need of diagnostic services to determine the existence or the nature and the extent of these problems, if any, the child shall be referred immediately to an appropriate professional for evaluation.

C. If the child is experiencing difficulties in the foster home, the social service worker shall determine whether the problem is being caused by any psychological, emotional or intellectual problem of the child and if necessary shall refer a child for diagnostic services as provided in paragraph B above.

D. In the event that it is determined that the child has an emotional, psychological or intellectual problem, defendants shall ensure that the child receives adequate professional services to treat the problem.

E. For all school age children the social service worker shall determine on a periodic basis, by at least a yearly visit to the child's school, the child's school performance. If deficient, the worker shall determine through a diagnostic referral or advice from the school the nature of the child's problems and shall arrange for the provision of adequate services to treat the problem.

## XIII. *Permanency Planning*

A. DFS shall implement permanent plans for each child in its custody to ensure that no child stays in foster care longer than is necessary. To meet this requirement, DFS shall establish the following system of permanency planning:

B. Preliminary Planning

1. A preliminary planning conference shall be held no more than one (1) month after each child enters the custody of DFS even if DFS only has temporary custody. The child's parents or the caretaking person with whom the child resided prior to entering DFS custody, and a legal representative of the parent(s) or caretaking person, if desired, shall be notified of the conference and their participation in the conference shall be facilitated in every way possible. A record shall be made of written notification to the parents and of efforts made to facilitate their attendance.

2. During the preliminary planning conference, a preliminary permanency plan for

the child, containing timetables, shall be developed, put in writing, signed by the social service worker, the supervisor, and, if the child's parents are in attendance, by the child's parents. In addition to containing timetables, this plan shall set forth with specificity the reason for the child's entering DFS custody, whether the plan is for the child to be returned to his/her family, the steps necessary to enable the child to be returned and how long each step should take to accomplish, including visitation schedules, indication of services to be provided to reduce problems that necessitated placement and who will provide and be responsible for monitoring service provision, precisely what DFS will do to accomplish each step and the parent's responsibility with regard to each step. Each step shall contain a timetable.

3. A written service agreement shall be made with each natural parent within thirty (30) days after the child comes into care unless there are documented reasons which render the making of a service agreement impossible because of the death or disappearance of a parent. The agreement shall specify the services which DFS shall provide the natural parent to enable the child to be reunited with his or her parent. The agreement shall be signed by all parties, provided however that the oral agreement of the natural parent is sufficient in the event that the natural parent assents to the agreement and the social service worker documents that the natural parent has refused to sign. In all cases, DFS shall provide the services agreed to.

4. If the Juvenile Court is involved with the family, the agreement shall be submitted to the Court for its review and approval. The Court shall then be given a copy for their file. Defendants shall provide the services required by this Agreement.

5. Visits

(a) DFS will ensure, unless it is documented to be impossible, or not in the best interest of the child, that weekly visits between the parent, child and siblings are arranged. Preferably, the visits shall take place in the natural family's or foster family's home. If this is not possible, they shall be in an appropriate, dignified setting providing a natural and homelike environment.

(b) Contacts by telephone or in writing, between visits shall be encouraged, but they are not replacements for visits.

C. Permanency Plans

1. No later than six months after the child has entered DFS custody a permanent plan shall be determined. This plan shall be approved, in writing, by the supervisor and the Permanency Planning Review Team. The permanent plan shall be either return home, adoption, emancipation or independent living. The plans of emancipation or independent living shall be limited to children sixteen years or older.

2. In the event any plan other than return home, adoption, emancipation or independent living is deemed appropriate, documentation for the plan must be submitted for the approval of the Juvenile Court and to plaintiffs for review.

3. Except in special circumstances, long-term foster care is an inappropriate plan and it shall not be used for any child who is less than fifteen years old. Such need shall be clearly documented.

4. The permanency plan for each child shall be reviewed every six (6) months by the child's social service worker, supervisor and the Permanency Planning Review Team. The permanent plan for each child shall be submitted annually to the Juvenile Court for review.

5. Except in special circumstances, DFS shall be prohibited from maintaining as a plan "return home" in any case in which there has been no contact between parent and child for six (6) months or longer. Such special circumstances shall be documented in writing. In the event that the plan is return home and a period of six (6) months thereafter passes with no contact between parent and child, that plan is no longer a valid plan and must be counted as an absence of a plan and a new plan developed.

6. With regard to all children for whom the permanent plan is adoption, where appropriate DFS will attempt to secure a voluntary relinquishment from the parent(s). No later than thirty (30) days after the plan of adoption has been entered in the record, and regardless of whether the social service worker is attempting to obtain a voluntary relinquishment, the worker shall forward all necessary documentation for the initiation of judicial proceedings to the appropriate legal department of DFS and the Juvenile Court. Nothing in this subparagraph shall be read to preclude the worker from attempting to obtain a voluntary relinquishment up until the time of trial.

7. A written summary of the child's history shall be submitted by the child's social service worker to the adoption unit no later than five (5) days after the documentation has been forwarded to the appropriate legal departments. In those instances in which the child is freed for adoption by the obtaining of a voluntary relinquishment, the child's summary shall be sent to the adoption unit no later than five (5) days after receipt of the voluntary relinquishment.

8. The adoption unit shall send at least one, and whenever possible, three home studies of appropriate prospective adoptive families to the social service worker no later than ten (10) working days after receipt of the material on the child, or if specific and identifiable facts related to this particular child's needs so require, within a further period not exceeding thirty (30) days from receipt of material on the child. If unable to identify at least one home study of an appropriate adoptive family, the adoption unit shall follow the steps indicated below.

9. If no home studies are sent and/or no initial family-child matching decision has been made within thirty (30) days after the material on the child is submitted to the adoption unit, specific adoptive family recruitment efforts in conformity with nationally recognized adoption recruitment techniques shall be undertaken immediately by the adoption unit in consultation with the adoption exchange of Missouri staff in central office (DFS). Such efforts shall be documented in writing.

10. If a child has not been matched within an adoptive family within 120 days after the efforts described above have been undertaken the child shall be referred immediately thereafter to specialized adoption agencies and adoption exchanges.

11. A list of specialized agencies and exchanges shall be developed and maintained by defendants and submitted to plaintiffs' counsel who shall have the right to add additional agencies and/or exchanges, to which defendants shall be obligated to refer children immediately in the event that the efforts described above shall prove unsuccessful.

12. DFS shall maintain aggregate records containing the following information for each child in DFS custody: the date the child entered DFS custody, the basis for legal custody, the date custody was obtained, the date a permanent plan was entered, what the plan is, the date of discharge from DFS custody, and the nature of the discharge. If a child enters DFS custody more than once, this data will be maintained for each entry. The format in which these records will be maintained shall be submitted to plaintiffs' counsel and plaintiffs shall have access to these records.

D. Permanency Planning Review Team

1. Permanency Planning Review is an administrative process conducted for the purpose of objectively determining the continued appropriateness of a child's placement, a child's progress in care toward the short and long range goals, and the need for continued care.

2. The Permanency Planning Review Team shall review the child's case plan, and any other relevant material and information, after the child has been in custody for six (6) months and every six (6) months thereafter.

3. The Permanency Planning Review Team shall prepare a written report with its recommendations, and any dissents therefrom, which shall be provided to the

child's social service worker, supervisor and the Juvenile Court.

4. The Permanency Planning Review Team shall include, at a minimum, the following: the social service worker, the supervisor, the natural parent(s), the child, if of an appropriate age, and at least one individual who is not employed with DFS and represents the community.

## XIV. *Establishment of Uniform Case Record System*

A. Defendants shall establish a uniform case record system which will ensure that all essential information regarding services provided to a foster child and his or her natural parents is accurately maintained.

B. Case Records

1. The contents of each case record shall follow the standard recommended by the Child Welfare League of America and at a minimum should record the following information in a clear and readily obtainable manner.

a. The Child's File

1. The child's name, age, siblings, address of natural parents.

2. The reasons the child came into care.

3. The current case plan and all prior case plans, each to be recorded on a separate clearly identifiable form to be developed.

4. The complete medical history of the child and a current up-to-date description of the child's medical problems and treatment.

5. Each social service worker visit with the child and the foster family, the date of the visit, any problems noted and services provided.

6. The number and ages of the children in the foster home.

7. The child's school, grade and school performance.

8. Any medical, emotional, psychological and intellectual problems that the child may have and the treatment provided and dates of treatment.

9. Each placement that the child has had, the reason for the placement, the reason why the foster home selected was chosen, the date of the pre-placement visit and, if there was an emergency placement, the reason for the emergency and the supervisor who approved the placement.

10. For each placement a statement about whether the placement violated the restrictions in the foster parents' license or the preferences of the foster parents.

b. The Foster Family File

1. The restrictions in the license and a statement of the preferences of the foster parents.

2. The dates and places on which the parents received foster parent training and a statement that the foster parent has satisfactorily completed all required training.

3. The application for a foster parent license and a record of all information collected in evaluation and approval of the license.

4. The dates of each social service worker contact with the foster parents and a statement as to whether the contact was a personal visit or a telephone contact.

5. Any problems the foster family has and services offered to assist with these problems.

6. Any reports of abuse or neglect and the outcome of investigations of abuse and neglect until required to be expunged by law.

7. The number and age of the foster children in the home and the dates on which each child entered the home and left the home.

c. The Natural Parents' File

1. A description of the reason for removing the child from the parent.

2. A copy of the case plan for the family including the temporary case plan, and the current permanent plan.

3. A copy of each written service agreement with the parent.

4. An accurate record of the services actually provided to the parent, the dates

on which the service was provided and the nature of the service. If the parent failed to avail him or herself of the service, the reason for this failure.

5. A statement of the date of each visit between the child and the parent, the duration and place of the visit.

6. Each social service worker contact with the parent, whether the contact was in person or by phone, the date of the contact and a description of the nature of the contact.

2. The uniform case record system shall be developed within three (3) months of the date of this decree and shall be submitted to plaintiffs' counsel for their review.

C. Review of Records

A supervisor shall review the records of each foster child, natural parent and foster parent at least once every month with the social service worker assigned to that person to determine whether the social service worker is adequately performing the duties required by the provisions of this decree and to ensure that all parties are receiving the services required by this agreement.

XV. *Reporting and Monitoring*

In order to monitor compliance with the terms of this decree the following monitoring provisions shall be placed into effect:

A. The defendants shall take all necessary steps to conform all departmental rules, regulations, directives and other administrative orders to the terms of this decree.

B. The defendants shall designate a person to oversee the implementation of the provisions of this decree and report to defendants on a regular basis the extent of compliance with the decree and recommended steps necessary to achieve full compliance.

C. On a semi-annual basis after entry of the decree for a period of five (5) years the defendants will provide to plaintiffs' counsel a written report of the extent of compliance with the decree including at least the following:

1. The number of hotline reports made in the period reported concerning suspected abuse or neglect of any member of plaintiff class, a description of the injury done to each child, and the results of the investigation and defendants' response to it.

2. The numbers of foster parents and social service workers who received training in the period which is the subject of the report, and the number who still require training and defendants' schedule for providing it.

3. The number of movements that occurred by foster children and the number of children who had more than two placements while in foster care broken down into the number of children placed in 2 homes, 3 homes, 4 homes, 5 homes, 6 or more homes, since coming into Jackson County DFS' custody.

4. The number of' placements for which there was no pre-placement visit, the ages of the children involved and an explanation of the facts in each case that accounted for the lack of a pre-placement visit.

5. The number of children and the ages of the children who were not supervised by social service workers in the manner and within the time periods contained in this decree and the reason in each case that the required level of supervision was not obtained.

6. The number of foster home placements, and the age of the children involved, not in accordance with the preferences or restrictions in the foster parent license and a statement of the facts that account for each such placement.

7. The number and ages of children placed in overcrowded homes, as defined by this decree, and a statement of the facts that account for each such placement.

8. The number of children in foster care, the length of time children have remained in care, the number of referrals for termination of parental rights, the number of children placed in adoptive homes and the number of children returned home or adopted by the length of stay of these children.

9. The number of children under the age of fifteen whose case plan is long-term foster care and a statement of the facts that account for this plan in each case, and the number of children who have had no contact with their parents for six (6) months or longer and have a case plan of return home and a statement of the facts that account for this plan in each case.

10. The number of social service workers and supervisors providing care to foster children and the caseload limits provided for in this decree have been covered by a social service worker for periods in excess of two (2) weeks. If caseloads limits have been exceeded or if uncovered caseloads have occurred, an identification of the caseloads involved shall be specified and a statement of the facts that accounts for the occurrence shall be provided.

D. The defendants shall permit plaintiffs' counsel and their designated experts to have access to defendants' casefiles and records maintained in accordance with this decree on a quarterly basis upon request. Plaintiffs shall keep confidential the names of any foster children and parents contained in these records.

E. Defendants shall respond to written or oral questions from plaintiffs' counsel relative to implementation of the judgment.

F. The defendants have no objection to plaintiffs seeking permission from the Juvenile Court of Jackson County to establish a procedure whereby each foster child's case under the jurisdiction of that court is reviewed by the court on a semi-annual basis to determine whether adequate child protection procedures as required by this decree have been implemented in each case. The results of these reviews shall be reported to defendants and plaintiffs' counsel.

G. This decree shall remain in full force and effect unless specifically modified by agreement of the parties. Prior to initiating formal enforcement proceedings, plaintiffs shall notify defendants of any area(s) of noncompliance and shall attempt to resolve such issues without the assistance of the Court. In the event that the issues are not resolved within thirty (30) days following notice to defendants, plaintiffs may move the Court to enforce this decree.

XVI. *Costs and Attorneys' Fees*

Defendants shall pay plaintiffs' counsel, within sixty (60) days after the date of entry of this decree the sum of Forty Thousand Dollars ($40,000) in full payment of all costs and attorneys' fees, pursuant to 42 U.S.C. § 1988, incurred from the inception of this case until the entry of this decree.

XVII. *Damage Claim*

It is mutually agreed, by and between the parties, that the claims of the named plaintiffs for damages in this case shall be withdrawn and dismissed by the Court.